UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


BRIAN BUCKLEY

     Applicant,

v.                                     CASE NO. 8:15-cv-1068-T-23SPF

SECRETARY, Department of Corrections,

     Respondent.

_____/


**O R D E R**

     Brian Buckley applies for the writ of habeas corpus under 28 U.S.C. § 2254

(Doc. 1) and challenges the validity of his state conviction for burglary of a dwelling,

for which conviction Buckley serves twenty years imprisonment. Numerous exhibits

("Respondent's Exhibit __") support the response. (Doc. 9) The respondent admits

the application's timeliness. (Doc. 9, p. 3)

**FACTS**[1]

     Buckley and a group were standing outside when the victim, Buckley's

neighbor, arrived home. When the victim and her friend exited their car, Buckley

and others in the group yelled at the victim and threatened to kill her. Buckley

chased the victim into her home. Buckley punched a hole in the victim's front door,

reached into the hole, and tried to unlock the door. The victim could see Buckley's

_____

     [1] This factual summary derives from Buckley's brief on direct appeal and the record.
(Respondent's Exhibits 1 and 2A)

face and his tattooed arm as he tried to unlock her door. The victim called the police

as Buckley tried to enter her home. Buckley was arrested and charged with burglary.

A jury convicted Buckley and the judge sentenced him as a habitual felony

offender to twenty years imprisonment.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA")

governs Buckley's application. *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210

(11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d), which creates a

highly deferential standard for federal court review of a state court adjudication,

states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim —
>
>> (1) resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light
>> of the evidence presented in the State court
>> proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), the Supreme Court

interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of
> a federal habeas court to grant a state prisoner's application for
> a writ of habeas corpus with respect to claims adjudicated on
> the merits in state court. Under § 2254(d)(1), the writ may issue

only if one of the following two conditions is satisfied — the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *See White v. Woodall*, 572 U.S. 415, 427 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question . . . .") (citing *Richter*); *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) ("And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quoting *Woodall*, 572 U.S. at 419). *Accord Brown v.*

- 3 -

*Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. at 694. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."). When

the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. "[T]he State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court on direct appeal affirmed Buckley's conviction and sentence. (Respondent's Exhibit 3A) The state appellate court affirmed the denial of Buckley's Rule 3.850 motion for post-conviction relief. (Respondent's Exhibits 6A and 7D) The state appellate court's *per curiam* affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003). *See also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."), and *Bishop v. Warden*, 726 F. 3d 1243, 1255–56 (11th Cir. 2013) (describing the difference between an "opinion" or

"analysis" and a "decision" or "ruling" and explaining that deference is accorded the state court's "decision" or "ruling" even absent an "opinion" or "analysis").

As *Pinholster*, 563 U.S. at 181–82, explains, review of the state court decision is limited to the record that was before the state court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, i.e., the record before the state court.

Buckley bears the burden of overcoming by clear and convincing evidence a state court's fact determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001). The state court's rejection of Buckley's post-conviction claims warrants deference in this action. (Respondent's Exhibits 4E and 4G)

## INEFFECTIVE ASSISTANCE OF COUNSEL

Buckley claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of

ineffective assistance of counsel are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Buckley must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691. To meet this burden, Buckley must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Buckley cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers,

in every case, could have done something more or something different.  So,

omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or

appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger*

*v. Kemp*, 483 U.S. 776, 794 (1987)).  The required extent of counsel's investigation

was addressed recently in *Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir.

2014), *cert. denied sub nom., Hittson v. Chatman*, 135 S. Ct. 2126 (2015):

> [W]e have explained that "no absolute duty exists to
> investigate particular facts or a certain line of defense."
> *Chandler*, 218 F.3d at 1317. "[C]ounsel has a duty to make
> reasonable investigations or make a reasonable decision that
> makes particular investigations unnecessary." *Strickland*,
> 466 U.S. at 691, 104 S. Ct. at 2066 (emphasis added).
> "[C]ounsel need not always investigate before pursuing or not
> pursuing a line of defense. Investigation (even a nonexhaustive,
> preliminary investigation) is not required for counsel reasonably
> to decline to investigate a line of defense thoroughly." *Chandler*,
> 218 F.3d at 1318. "In assessing the reasonableness of an
> attorney's investigation . . . a court must consider not only the
> quantum of evidence already known to counsel, but also
> whether the known evidence would lead a reasonable attorney
> to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct.
> at 2538.

*See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (confirming that counsel has no duty

to raise a frivolous claim).

Under 28 U.S.C. § 2254(d) Buckley must prove that the state court's decision

was "(1) . . . contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States or

(2) . . . based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  Sustaining a claim of ineffective assistance

of counsel is very difficult because "[t]he standards created by *Strickland* and

§ 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is

'doubly' so." *Richter*, 562 U.S. at 106. *See also Pinholster*, 563 U.S. at 202 (An

applicant must overcome this "'doubly deferential' standard of *Strickland* and [the]

AEDPA."), *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011)

("Double deference is doubly difficult for a petitioner to overcome, and it will be a

rare case in which an ineffective assistance of counsel claim that was denied on the

merits in state court is found to merit relief in a federal habeas proceeding."), and

*Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must

view Pooler's ineffective counsel claim — which is governed by the deferential

*Strickland* test — through the lens of AEDPA deference, the resulting standard of

review is "doubly deferential."), *cert. denied*, 134 S. Ct. 191 (2013).

In denying Buckley's motion for post-conviction relief, the state court

recognized that *Strickland* governs a claim of ineffective assistance of counsel.

(Respondent's Exhibits 4E and 4G)  Because the state court correctly recognized that

*Strickland* governs each claim of ineffective assistance of counsel, Buckley cannot

meet the "contrary to" test in Section 2254(d)(1).  Buckley instead must show that the

state court unreasonably applied *Strickland* or unreasonably determined the facts.  In

determining "reasonableness," a federal application for the writ of habeas corpus

authorizes determining only "whether the state habeas court was objectively

reasonable in its *Strickland* inquiry," not an independent assessment of whether

counsel's actions were reasonable. *Putnam v. Head*, 268 F.3d 1223, 1244, n.17 (11th Cir. 2001), *cert. denied*, 537 U.S. 870 (2002). The presumption of correctness and the highly deferential standard of review requires that the analysis of each claim begin with the state court's analysis.

**Ground One**

Buckley contends that his trial counsel rendered ineffective assistance by not advising him before the state withdrew its plea offer that he qualified for an enhanced sentence as a habitual felony offender. Buckley alleges that before trial his counsel told him that he had a "very good" chance of acquittal and that the "worst case scenario" was a conviction for the lesser-included offense of trespass. (Doc. 1, pp. 4–5) Buckley asserts that "[a]t no time prior to or during plea negotiations did [c]ounsel ever advise [him] of possible sentencing as a habitual felony offender and the ramifications thereof, nor what exactly the maximum sentence [was that] he could receive."[2] (Doc. 1, p. 5) Buckley further asserts that, because trial counsel advised him that he faced a sixty-month sentence if convicted after a trial, he rejected a forty-two month plea offer from the state. According to Buckley, if trial counsel had properly advised him that he possibly faced a thirty-year sentence as a habitual felony offender, he would have accepted the plea offer and received a significantly shorter sentence.

---

[2] The state filed its notice of enhanced sentencing after the trial but before the sentencing hearing. *See* Fla. Stat. § 775.084(3)(a)(2) ("Written notice shall be served on the defendant and the defendant's attorney a sufficient time prior to the entry of a plea *or prior to the imposition of sentence* in order to allow the preparation of a submission on behalf of the defendant.") (emphasis added).

The record shows that on the morning of trial, Buckley's counsel advised the judge that the parties could not reach a plea agreement (Respondent's Exhibit 1, Vol. II, pp. 4–7):

> [COUNSEL]: Judge, I wanted to make a record here. I've been talking with the State about a possible resolution of this case, making Mr. Buckley aware of where we were, the possibility of even a reduced charge and the bottom of the guidelines sentence.
>
> I've communicated that to Mr. Buckley, that I felt that the State was inclined to accept a reduced charge of attempted burglary and the bottom of the guidelines and it's 42.2 months, I believe it was. That was rejected and I went back with a counteroffer and Mr. Buckley has chosen not to accept any negotiated plea that we could come to. So, thus, we're proceeding to trial.
>
> I simply wanted to state that for the record. If I said something incorrectly, I would rather Mr. Buckley say I got it wrong somehow.
>
> THE COURT: Mr. Buckley, that's why your lawyer is doing this, to make sure there isn't any miscommunication and make clear on the record if you think he has stated something that you misunderstood, maybe that's the time to get it right.
>
> THE DEFENDANT: I agree with him.
>
> THE COURT: Then we're set. Everybody knows what the situation is. Are we ready to bring the jury in?
>
> [COUNSEL]: Yes, Judge.

The state post-conviction court afforded Buckley an evidentiary hearing on this ground of ineffective assistance of trial counsel. Buckley testified on direct examination at the evidentiary hearing that he would not have ended plea negotiations if his trial counsel had told him that he faced a possible sentence enhancement (Respondent's Exhibit 4, Vol. 5F, pp. 73–76):

Q: Did you ever discuss with Mr. Irvin possible negotiations in terms of resolving the case or pleading to the case without having a trial?

A: Yes, sir.

Q: What do you recall about that?

A: Mr. Irvin came to me right before trial and told me that he was inclined to believe that the State was going to give me a bottom of the guidelines sentence of 42 months and I told him . . . to try to get me two years and he said that he's trying to get me three years and he went in with the three years and I rejected that. And then he went back in, I guess, and then he came out and I told him that I wanted to stop plea negotiations.

Q: You wanted to stop plea negotiations?

A: Yeah, [b]ecause they didn't want to give me nothing, you know what I'm saying? They wanted to give me 42 months and I didn't want to take 42 months.

Q: At that point in time were you made aware of what the maximum penalty for second-degree burglary was?

A: I had no idea, sir.

. . . .

Q: Let me ask you this. If you had been aware, prior to going to trial, that your exposure could have been 30 years, do you believe that it would have impacted your decision to go to trial?

A: I believe I would have took the 42 months even though . . . I wasn't guilty because 30 years was a long time for somebody my age and my health.

Q: So the fact that you did not know that you could have been designated [as a] habitual felony offender, you believe impacted your decision to go to trial?

A: Yeah. If I knew I would have never stopped plea negotiations. I'd have tried to get something or took the 42 months or whatever, something besides what they gave me.

Buckley further testified on cross-examination at the evidentiary hearing

(Respondent's Exhibit 4, Vol. 5F, pp. 78–81):

Q: Okay. Now, we talked a little about this 42-month offer. That was your offer, correct?

A: That was not my offer. That was the State's offer.

. . . .

Q: What I'm trying to say, Mr. Buckley, the transcripts revealed that that was your offer and the State rejected it, doesn't it?

A: No. That was not my offer, no. That was not my offer. I know exactly what you're talking about when Mr. Irvin said he was inclined to believe that the State . . . he was talking to the State about a possible resolution of the bottom of the guidelines sentence at 42 point something months. He went in and that was rejected by me. He went in and tried to get me three years. I asked Mr. Irvin to get me two years, he said he was trying to get me three. He came back. They wanted to still give me the 42 months. I didn't want 42 months because I was not guilty.

Q: So . . . you were present, right, when Mr. Irvin talked about that on the record?

A: Yes, sir. That's how I remember it.

Q: Okay. So when he said on the record that that was rejected, you're saying that that was by you?

A: That was rejected by me. I didn't want the 42 months . . . .

Q: So you're claiming . . .

A: . . . they had three years, which is the counteroffer that he talks about. How can you have a counteroffer if there is no offer? They offered me 42 months.

Q: Your claim is that the State offered you 42 months?

A: The State did offer me 42 months.

Q: Okay. And the most you would have accepted was the three years?

A: Yes. I wanted to get two and Mr. Irvin said he was trying to get me three. So I said, okay, I'll take the three if we could get it, even though I was not guilty.

Q: Now you claim the fact of your . . . having a habitual felony offender designation, that would have changed this decision?

A: Most definitely. Would you take a chance on getting 30 years if you could have got 42 months? That's insane.

Q: So your claim is that had you known about this, you would have accepted the State's 42-month offer?

A: Yes, sir.

When asked at the post-conviction evidentiary hearing about his recollection of the plea negotiations, trial counsel testified on direct examination as follows (Respondent's Exhibit 4, Vol. 5F, pp. 102–15):

Q: Now, there's been talk about the 42-month offer, what is your recollection about that offer?

A: I do not have a specific recollection about that. I just do not have a specific recollection about that other than the fact I don't know if the State was offering anything, quite frankly. I think that they perceived the people that lived on Teak Street at that particular address to really be a nuisance. And I don't think that the State was willing to, if my memory serves me correct, I don't think they offered anything like a bottom of the guidelines sentence. I may be wrong.

And had they offered a bottom of the guidelines sentence, considering the nature of what was going on with Ditullio[3] and all these other things, that probably would have been something that I would have recommended to Mr. Buckley that he accept because that's probably publicity he could not get around.

---

3 John Ditullio lived with Buckley and was outside with Buckley when the burglary occurred. Less than three weeks after the burglary, both the victim in Buckley's case and a teenage friend of her son were stabbed in the victim's home. The teenager died from his wounds. Ditullio was arrested and charged with committing the stabbings.

Q: So to your recollection, the 42-month offer was made by the Defense to the State?

A: I don't . . . if it's on the transcript, I'd let the transcript speak for itself. I just don't have a specific recollection and I have not reviewed that prior to testifying today.

Q: Would that help to review that portion of the transcript?

A: It probably would, yes.

. . . .

[PROSECUTOR]: Judge, I'm showing Mr. Irvin page five of the trial transcript.

. . . .

Q: Does that refresh your recollection as to the term of the circumstance of that offer?

A: It appears as though that there was . . . yeah, it refreshes my recollection as long as I'm reading it.

Q: Does it appear that that was an offer extended by the Defense to the State?

A: On this point, I think Mr. Buckley is correct. The State would have offered 42.2 and I couldn't have gone back with a counteroffer absent the fact of Mr. Buckley rejecting the offer, which would have preceded that. So on that point I think Mr. Buckley is correct. Do I have any specific recollection? Not necessarily, but I certainly don't dispute the transcript.

Q: Is it possible that there was counteroffer from the State to the 42-month offer from the Defense [?]

A: I would have . . . the preceding page, on page four, said that I wanted to make a record. So if in fact there had been one, I would have completed that record.

Q: Okay.

A: So I would say no.

Q: Did the defendant tell you that he had been previously labeled a habitual felony offender?

A: No, he did not.

Q: If he had told you that, would that have prompted you to explore the possibility of him being labeled again?

A: I certainly would have talked to him and say that they could habitualize you. I certainly would have said that to him. But at this point, they would not have and so it would not have affected how we were proceeding with the case. As long as he was not habitualized, it did not affect how we were proceeding.

Q: Jumping back briefly to the discussion about the enhanced penalty, when was the Defense presented with the notice of enhancement in this case?

A: It was after the trial and that's the only thing that I feel bad about. I really feel bad about that. I feel bad for Mr. Buckley because I did not advise him of the potential because I had never experienced in my years of practice where you got a notice of enhancement after the trial. Usually it's used as a negotiating tool to bring about a result to stop trial. And I don't know . . . I don't think there would be very many prosecutors who could stand up here and say that they usually present it after someone has gone to trial. That would surprise me.

Q: Do you think it's appropriate to advise your client that he's facing an enhanced sentence when there hasn't been a notice of enhanced penalty filed?

A: I don't believe that it would . . . kind of damned if you do, damned if you don't. If I had told him, perhaps, and this is all speculation, if I had told a client, not just Mr. Buckley but any client, that they were looking at an enhanced penalty and let's say we entered into a plea, they may get to prison, they have buyer's remorse and say my lawyer told me that I was looking at an enhanced penalty when, guess what, I never got the notice of enhancement, which is required to be filed by statute. So I want to undo this sentence here because I don't like it, because my lawyer talked to me about something speculative out there. And I think that if it comes back, he's probably right, that he may have done that. And that's what I felt bad about. I was just caught in a place that I had never been in before. And so, it seems like either way, if I had talked to him about it and told

- 17 -

him he was looking at 30, actually I'd be lying because he's not looking at 30 until he's enhanced . . . or the notice is provided.

Q: That's a discretionary matter with the State, right?

A: That is left up to the State, that is correct.

Q: And until the State files that notice, his maximum penalty was 15 years?

A: And that's exactly what I would have told him, exactly. That's exactly right which is what I felt it should have been because it went to trial. It still should have been 15 years but I lost that battle.

Q: And you raised that matter on appeal as well, correct?

A: I did raise . . . that matter on appeal. And I think I may have spoken to [the prosecutor] about that. But it was the State's position. Technically, technically they were right.

Q: And by that you mean, technically, the statute allows for the notice to be filed after the trial?

A: They could walk in two seconds before sentencing and hand it to you is the literal interpretation of the statute but I do not believe that has been a practice of [the state attorney]'s office. And so I was a bit caught off guard and that's not pointing a finger at anybody, but I feel horrible about that when it comes to Mr. Buckley because I would have twisted his arm, certainly, for 42 months. I'd have twisted his arm for 60 months, whether he would have taken it or not, I don't know.

The prosecutor testified at the evidentiary hearing about her recollection of the plea negotiations as follows (Respondent's Exhibit 4, Vol. 5F, pp. 126–29):

Q: Before the trial, were there any plea negotiations?

A: There was some plea negotiations. If there . . . what they were, I would have made note . . . in the file that I had. I know that there was some talk of pleading. At that point I was really interested in taking a plea. But there was negotiations and I believe that whatever negotiations there were were notated in

my file, which I don't have in front of me, but if you have it, I could look at it.

. . . .

I looked through this file several months ago. There's a different file where there's a handwritten note. Well, in the transcript it says, and this is Mr. Irvin speaking, ["]I've communicated that Mr. Buckley . . . that I felt that the State was inclined to accept a reduced charge of attempted burglary.["] So he wasn't even making an offer to a plea, not [sic] just to a certain sentence. He says, "inclined to accept the reduced charge of attempted burglary in the bottom of the guidelines." And I believe . . . that was rejected. I rejected that offer.

And I know there's a note somewhere in the file that says they offered a third-degree attempted burglary and the 42.2 months and I rejected that. There was no way I was going to take 42.2 months even for the second-degree. But he offered 42 something for a third-degree and that was rejected.

Q: So that offer, that 42-month offer, that came from the Defense?

A: Yes. And it wasn't just to the bottom of the guidelines, it was to the bottom of the guidelines in a third-degree felony. And I was not inclined to accept any offer in this case. And I remember writing somewhere on a note that there was no other offers they wanted to make.

So Mr. Buckley made it quite clear that if he didn't get the reduced sentence, forget the days, he wanted the third-degree and not the second-degree, that he was not inclined to take any offers. And he wouldn't waive speedy trial either.

Q: Did you make any offers in this case?

A: No. I would not have made any offers in this case. And I did not make any offers. I was trying all of the defendants in this Teak Street group. I had all of the defendants. And I didn't make any offers in any of the cases.

Q: So if the Defendant had made, say a ten-year offer to you, would you have rejected that?

A: I would have had to send that to [the state attorney]. That would have gone to [the state attorney]. I would not have accepted it. It would have had to go to [the state attorney].

The state post-conviction court denied this ground of ineffective assistance of trial counsel after the evidentiary hearing as follows (Respondent's Exhibit 4G, Order Denying Defendant's Motion for Post-conviction Relief, pp. 2–12) (court's record citations omitted):

> [T]he Defendant claims that prior to trial, Counsel informed him that based on the evidence that the State had provided in discovery the Defendant had a very good chance of being acquitted of the primary charge. He alleges that Counsel told him that the worst case scenario was that Defendant would be found guilty of a lesser-included offense. Defendant claims that if he had known about the possibility of an enhanced sentence, he would have accepted the State's plea offer of 42 months.
>
> . . . .
>
> **The Defendant's testimony**
>
> [T]he Defendant testified that during the attempted plea negotiations and the entire trial he was unaware of his maximum sentence. Specifically, he was not aware he would be sentenced as a habitual felony offender (HFO). The Defendant testified that had he been aware of his HFO status he would have accepted the 42-month plea deal.
>
> On cross-examination, the Defendant testified that counsel told him that at worst he could be convicted of trespass, which would carry a maximum penalty of 5 years. The Defendant further testified that it was the State, not him, who made the 42-month offer. Specifically, he testified that the State offered him 42 months, he told his counsel to try to get him two years, counsel said he would counteroffer three years, and after speaking with the State told the Defendant that the State still wanted to give him 42 months. The Defendant further testified that having an HFO designation would have changed this decision, as it exposed him to a maximum penalty of 30 years. At this point the State introduced State's Exhibit 1, which was a notice of enhanced penalty from case number

CRC00-00660CFAWS.[4] The Defendant replied that he had never seen that and he did not sign it.

. . . .

The Defendant testified that despite his ineffective assistance of counsel claims, he elected to have the same attorney file his appeal, and has been in contact with the attorney since then, maintaining a good relationship with him. On re-direct, the Defendant testified again that he had never seen the notice of enhanced penalty [from his prior case number CRC00-00660CFAWS], and that on that case he took a negotiated plea of 18 months, and was not sentenced as an HFO. The Defendant again testified that he would have further negotiated in an attempt to resolve the case had he known of the HFO enhancement.

. . . .

**Grady Irvin**[5]

The State called Grady Irvin, Defendant's trial counsel, as its witness. Mr. Irvin testified that he would not have told the Defendant that "the only thing that the State could have convicted on would have been trespass because on any given date the Jury can convict him of anything." He further testified that he may have told the Defendant that he thought trespassing was the strongest case the State had against him, but never told him that was the only thing they could convict him of or promised any particular outcome at trial. Irvin testified that he never told the Defendant that the maximum amount of time he was facing was five years. As to the 42-month offer, although Irvin had no specific recollection, after reviewing the transcript he testified that he believes the State made the offer of 42 months, and he went back with a counteroffer.

. . . .

As to the enhanced penalty, Irvin admitted that he did not advise him of the potential for enhancement, as he had

---

[4] This is an unrelated earlier case in which Buckley pleaded guilty.

[5] The state post-conviction court's order misidentifies Buckley's trial counsel as "Grandy Irvine." This order identifies counsel as "Grady Irvin" as designated in the trial transcript and the state court record.

never had the experience of getting a notice of enhancement after the trial. When asked if it is appropriate to advise a client he is facing an enhanced sentence when there hasn't been a notice of enhanced penalty filed, Irvin responded that if he did that, there was the chance that he would convince him to take a plea, then they would come back and say that since he never received an order of enhancement, his plea was entered based on speculation by his attorney and he wishes to withdraw it. Irvin opined that as the Defendant had not yet been enhanced, to tell him he is facing 30 years would be untrue. Irvin testified that he still believes the maximum sentence should have been 15 years, but although he raised the issue on appeal and with Judge Handsel, who was the prosecutor in the case, he conceded that technically the State could file the enhancement at any point before sentencing. Irvin stated that had he known the Defendant would receive an enhanced penalty he would have talked the Defendant into 42 or even 60 months.

On cross-examination, Irvin testified that he has received many notices of enhancement, but this was the only time he had ever been noticed after the trial. He testified that had he known the Defendant would be enhanced, "Brian Buckley would have been doing 42 months in prison right now if that was indeed an offer that had been made from the State. Brian would be doing it and I would have stuck it down his throat and he'd have taken it." Irvin testified that he felt bad about this, as he was not able to do his job since the State did not notice the Defendant of enhancement before the trial. Irvin further testified that after reviewing the transcript, he believed the 42-month offer was from the State.

**Mary Handsel**

On direct-examination, Judge Handsel testified that she represented the State at trial in this case. . . . Regarding the 42-month plea, upon reviewing the file and the trial transcript, Judge Handsel testified that it was the Defendant who made the 42-month offer, which was bottom of the guidelines for a third-degree felony, even if he was charged with a second-degree felony. She further testified that it was clear that if the Defendant didn't get the reduced charge of third-degree attempted burglary, then he did not want to accept the plea. She stated, "I would not have made any offers in this case. And I did not make any offers. I was trying all of the defendants in this Teak Street group. I had all of the defendants. And I didn't make any offers in any of the cases." Lastly, she

testified that if the Defendant had made an offer of ten years, she would have had to present the offer to [the state attorney], but may have recommended that he accept it, provided the Defendant testified against Ditullio.

On cross-examination, Judge Handsel testified that the case had been assigned to [a different state attorney], but when the Defendant refused to waive speedy trial, she took it back, as the plan was for her to try it all along. Judge Handsel stated that she did not recall what the counteroffer to the 42-month offer was, but said he may have come back with straight second-degree burglary and 42 months, but she would not have accepted that either.

On the issue of the HFO enhancement, Judge Handsel testified that the paperwork had been started and she thought it had actually been filed, but when the trial ended and she realized it hadn't, she told the Court that it would be filed the next day. She further testified that this is allowed by the statute. Judge Handsel testified that she does not use the decision to habitualize someone to force them to plead, instead she files the paperwork if the defendant meets the criteria for the statute.

**Closing Statements**

During the Defendant's closing argument, [post-conviction] counsel argued that the fact that the Defendant was never made aware that he could be habitualized was critical to the case and warrants a new trial. He argued that had the Defendant known that his potential sentence would have been 30 years, he would have continued to pursue negotiations. Based on Mr. Irvin['s] and the Defendant's testimony, counsel argued that it is clear that this would have fundamentally changed their position, and they would have attempted to negotiate further to avoid the potential of 30 years in prison. The Court then inquired as to the significance of the fact that according to Judge Handsel, there was no offer of 42 months, reasoning that if that is true, the Defendant would not be able to accept an offer that doesn't exist. Counsel agreed that he could not, but argued that a doubling of the sentence would have provided major motivation for the Defendant to resolve the case by plea. Upon further questioning from the Court, counsel responded that he believed finding out the Defendant could be habitualized would cause him to realize that he should waive speedy trial and continue negotiations, as "the State is obviously serious about, you know, putting me away for as long

as possible." The Court acknowledged that this would require speculation, and further asked if the Defendant was willing to risk 15 years, is it that much of a stretch that he would risk 30 years. Defense counsel responded that he believes the doubling of a sentence is a big difference, and it is reasonable to assume he would have approached negotiations differently had he been aware. Counsel argued that a cursory look at the Defendant's background should have alerted Mr. Irvin to discuss with him the possibility of enhancement, even though he testified this was the first time in his career the notice of enhancement was filed after the trial ended.

In its closing argument, the State argued that the evidence presented by the Defendant, particularly that Defendant believed the most he could be convicted of was five years for trespass, was not credible. The State argued that the Defendant's assertion that he would have accepted a different outcome or negotiated further for a plea is not credible, as he believed he was innocent, and wanted to go to trial to prove his innocence. Accordingly, the State argues that the potential sentence did not have any effect on his decision to go to trial. Additionally, the State argues that despite the failures alleged against Mr. Irvin, he has never mentioned these issues at trial, at sentencing, or to Mr. Irvin throughout their correspondence. The State argues that the issue is whether Mr. Irvin's performance departs from prevailing professional standards, such that he acted deficiently as an attorney. The State argues that he did not, and that it was perfectly reasonable to tell the Defendant the actual maximum sentence, and not the potential maximum sentence with habitualization. In fact, the State argues, to inform him of the potential of a 30-year sentence would have led to a post-conviction claim that he was coerced into the plea, as he was told that he was facing 30 years when in fact he was facing 15 years. Additionally, the State argued that Mr. Irvin did act within the broad range of competent performance under prevailing professional standards, as this was the first and only time he had ever experienced this in his many years as a criminal defense attorney.

Moreover, the State argues that the Defendant has failed to show prejudice. Specifically, that if he was aware of the HFO enhancement, he would have done something that would have created different results. As the State contends that there was no 42-month offer made from the State to the Defendant, there is no evidence of what the Defendant would have done differently, and requires speculation from the Court.

. . . .

## Analysis

Following a 3.850 evidentiary hearing, this Court is tasked with making findings of fact and conclusions of law respecting the evidence and argument presented at the hearing. *See* Fla. R. Crim. P. 3.850(d); *see also Thomas v. State*, 954 So. 2d 56 (Fla. 1st DCA 2007). This Court finds that the Defendant has failed to demonstrate either deficient performance on the part of his former trial counsel or any resulting prejudice.

**Ground One**: As to the Defendant's claim that his trial counsel told him that the worst case scenario was that the Defendant would be convicted of trespass and face a maximum sentence of 5 years, the Court finds the testimony of Irvin to be more credible than that offered by the Defendant. Mr. Irvin testified that he would not have told the Defendant that the most severe charge he could be convicted of was trespass when he was charged with burglary. Mr. Irvin testified that it has never been his practice in his many years as a defense attorney to guarantee any outcomes. When the court is called upon to make a factual determination and is presented with conflicting testimony, it is within its province to weigh the credibility of the witnesses to resolve the factual dispute. *See Alston v. State*, 894 So. 2d 46, 54 (Fla. 2004); *see also Smith v. State*, 691 So. 2d 991 (Fla. 4th DCA 1997). After reviewing the testimony and weighing the credibility of the witnesses, this Court finds the testimony of the State's witness to be more credible than that of the Defendant.

The Court now addresses the Defendant's claim that counsel was deficient for failing to advise the Defendant of the potential for an enhanced sentence, and that he would have negotiated further in an attempt to avoid going to trial. The Court finds that the Defendant failed to show requisite prejudice under *Strickland*. To satisfy the prejudice test, the defendant must show that there is a reasonable probability that the outcome would have been different absent the ineffective assistance. *Haliburton v. Singletary*, 691 So. 2d 466, 470 (Fla. 1997). In this case, the Defendant alleges that the outcome would be different had he been aware of the potential enhancement. Be that as it may, the Defendant fails to specifically state how the outcome would be different. Although the Defendant claims that he would have accepted the 42-month offer, despite the testimony of the Defendant, Mr. Irvin, and Judge Handsel, it is unclear who made that offer. On one hand, Mr. Irvin testified that he

had no direct knowledge, but based on the transcript it appears that the State had made that offer. On the other hand, Judge Handsel definitively stated that she would not have made that offer, and that any offer she considered would have required the Defendant to testify against Mr. Ditullio. Based on the evidence, the Court cannot conclude that the State made an offer of 42 months to the Defendant. Therefore, the Defendant's claim that the result would have been different requires the Court to speculate, as neither the record nor the evidentiary hearing could show that a plea agreement for less than twenty years definitely would have been reached.

In *Bass v. State*, 932 So. 2d 1170 (Fla. 2d DCA 2006), the Court held that the Defendant's post-conviction claim was based on speculation, where he claimed that the State would have reinstated certain plea offers if an error was corrected. In *Bass*, the Defendant argued that if counsel had investigated his prior criminal history and informed the State of an error, the State would have reinstated one of its prior plea offers, which the defendant would have accepted. The court found that the claim was speculative as to whether the State would have reinstated the offers, and "post-conviction relief cannot be based on pure speculation." *See id*. Moreover, a defendant is not entitled to a plea offer from the State, that is discretionary and it is completely within the State's [discretion] to give, rescind, or refuse any offer up until it is accepted by a trial judge formally. *See id*. The Defendant's claim that he would have negotiated more in an effort to avoid going to trial is speculative, as there is no way that the Court can determine whether or not the parties would have reached an agreement. As the Defendant has failed to show prejudice, this claim is denied. In the event that the defendant fails to satisfy one component, the inquiry ends, and the reviewing court need not determine if the defendant has satisfied the other. *Maxwell v. Wainwright*, 490 So. 2d 927 (Fla. 1986).

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016). A question of the credibility and demeanor of a witness is a question of fact. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (citing *Freund v. Butterworth*, 165 F.3d 839, 862

(11th Cir. 1999) (*en banc*)). Under Section 2254(e)(1), "[f]ederal habeas courts

generally defer to the factual findings of state courts, presuming the facts to be correct

unless they are rebutted by clear and convincing evidence." *Jones v. Walker*, 540 F.3d

1277, 1288 n.5 (11th Cir. 2008) (*en banc*). *See also Devier v. Zant*, 3 F.3d 1445, 1456

(11th Cir. 1993) ("Findings by the state court concerning historical facts and

assessments of witness credibility are . . . entitled to the same presumption accorded

findings of fact under 28 U.S.C. § 2254(d)."), *cert. denied*, 513 U.S. 1161 (1995).

"Determining the credibility of witnesses is the province and function of state courts,

not a federal court engaging in habeas review. Federal habeas courts have 'no license

to redetermine credibility of witnesses whose demeanor was observed by the state

court, but not by them.'" *Consalvo*, 664 F.3d at 845 (quoting *Marshall v. Lonberger*,

459 U.S. 422, 434 (1983)). This deference applies to a credibility determination that

resolves conflicting testimony. *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir.

1998) ("We must accept the state court's credibility determination and thus credit

[the attorney's] testimony over" the applicant's testimony.); *cert. denied*, 526 U.S.

1047 (1999). The deference is heightened when reviewing a credibility determination

in a Section 2254 application. *Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1300 (11th

Cir. 2007), *cert. denied*, 552 U.S. 1190 (2008). *Accord Kurtz v. Warden, Calhoun State

Prison*, 541 F. App'x 927, 929 (11th Cir. 2013) ("'A certain amount of deference

is always given to a trial court's credibility determinations,' and a credibility

determination in a case on habeas review receives heightened deference.") (quoting

*Gore*, 492 F.3d at 1300), *cert. denied sub nom, Kurtz v. Jeanes*, 134 S. Ct. 2728 (2014).

The state court's credibility determination is presumed correct. *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the [witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

As to Buckley's claim that his trial counsel misadvised him that the "worst case scenario" was a conviction for trespass resulting in a five-year sentence, Buckley cannot obtain relief. The state post-conviction court found counsel more credible than Buckley. Buckley presents no basis for rejecting the state post-conviction court's credibility determination. *See Jones*, 540 F.3d at 1288 n.5.

Buckley likewise cannot obtain relief on his claim that his trial counsel rendered ineffective assistance by not advising him that he possibly faced a sentence enhancement. "The Supreme Court has long recognized that *Strickland's* two-part inquiry applies to ineffective assistance of counsel arising in the plea process." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). *McMann v. Richardson*, 397 U.S. 759, 771 (1970), explains that a court should determine not whether "counsel's advice [was] right or wrong, but . . . whether that advice was within the range of competence demanded of attorneys in criminal cases."

Even assuming that Buckley establishes deficient performance, he fails to demonstrate resulting prejudice. *See Diaz v. United States*, 930 F.2d 832, 835 (11th

Cir. 1991) ("[A]fter the fact testimony concerning [the] desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, [the applicant] would have accepted the plea offer."). *Lafler v. Cooper*, 566 U.S. 156, 163–64 (2012), explains:

> In contrast to *Hill*, here the ineffective advice led not to an offer's acceptance but to its rejection. Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Buckley claims that the prejudice he suffered as a result of counsel's alleged error is that he forwent the 42-month plea offer. Because Buckley fails to establish that the state offered a 42-month plea that he could have accepted, he fails to establish prejudice. Because he cannot demonstrate prejudice as described in *Lafler* and *Strickland*, Buckley fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground of ineffective assistance of counsel. 28 U.S.C. § 2254(d)(1), (d)(2).

**Ground Two**

Buckley contends that his trial counsel rendered ineffective assistance by not calling John Ditullio, John Berry, Corey Petnod, Christine Cristinzio, Jill Nangano, and Shawn Plot as witnesses at trial. Buckley alleges that Ditullio, Berry,

Petnod, and Cristinzio all were present when the crime was committed and that Plot — not Buckley — committed the crime. Buckley alleges that Nangano and Berry would have testified that he received the tattoo on his forehead before the crime occurred and that Berry would have testified that he was the tattoo artist who put the tattoo on Buckley's forehead.[6] Buckley claims that Plot would have testified that he committed the crime "and even if Mr. Plot would not have implicated himself, he could and would have testified to [Buckley]'s innocence and that [Buckley] had the questionable tattoo at the time of the alleged crime." (Doc. 1, p. 7) Buckley asserts that he advised counsel before trial of each witness's name, their proposed testimony, their location, and their contact information. He claims that these witnesses' testimony would have lent credibility to his misidentification defense, likely resulting in an acquittal. Buckley further asserts that trial counsel failed to call some unnamed police officers who responded to the crime scene. Buckley alleges that these officers would have testified (1) that each of the six named witnesses was present at the scene when the officers arrived and (2) that Buckley had a tattoo on his forehead.

---

[6] At the time of trial Buckley had a prominent tattoo on his forehead. The state asserted in its opening statement at trial that "at the time this [crime] occurred, Mr. Buckley doesn't look like he does today . . . he had no tattoo on his forehead." (Respondent's Exhibit 1, Vol. III, p. 141) The victim testified that Buckley did not have the forehead tattoo on the day of the crime. (Respondent's Exhibit 1, Vol. III, p. 180) The defense called a witness at trial who testified that Buckley had gotten the tattoo in 2005, well before the crime occurred in 2006. (Respondent's Exhibit 1, Vol. III, pp. 299–300)

**Nangano, Plot, and the unnamed police officers**

The state post-conviction court summarily rejected this ground as to Nangano, Plot, and the unnamed police officers as follows (Respondent's Exhibit 4E, Order Granting Evidentiary Hearing in Part; Denying in Part Defendant's Motion for Post-conviction Relief, pp. 3–6) (court's record citations omitted):

> Defendant claims that Counsel was ineffective for failing to call six witnesses to testify on his behalf. Defendant's claim has three parts, each of which will be addressed separately.
>
> . . . .
>
> Ground Two (B): Defendant claims that Counsel was ineffective for failing to call Jill Nangano, . . . and Shawn Plot to testify at trial. The Defendant asserts that they would have testified that Defendant had the tattoo on his forehead at the time of the crime. The Defendant asserts that this would have supported the defense theory of misidentification, since the State's witnesses testified that the person who committed the crime did not have a tattoo on his forehead.
>
> At trial, Counsel called Marie Hrynak as a witness. She testified that Defendant obtained the tattoo on his forehead after [Buckley's] son died, which would have been in June or July of 2005. This testimony asserted that Defendant did have the tattoo on his forehead at the time of the crime. Thus, the Defendant cannot demonstrate prejudice where the testimony of the . . . witnesses would have been cumulative to the testimony already provided. *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007). Accordingly, Ground Two (B) is denied.
>
> Ground Two (C): Defendant claims that Counsel was ineffective for failing to call Shawn Plot as a witness. Defendant alleges that Shawn Plot would have testified that he committed the crime, that Defendant was innocent, and that Defendant had the tattoo on his forehead at the time of the crime. To the extent that the Defendant is alleging Counsel was ineffective for failing to call Shawn Plot to testify about the tattoo, the Court addressed this claim in Ground Two (B) and will not address it again.

The Court finds that the Defendant agreed at the start of the trial that Shawn Plot would not testify. Specifically, Counsel told the Court that he had discussed Shawn Plot testifying with his attorney [sic], and they had determined that Shawn Plot may possibly incriminate himself in an ongoing homicide case and he would not be called. Counsel further explained that this had all been discussed with the Defendant. Additionally, the Court asked the Defendant if Counsel had misstated anything, to which Defendant responded, "I agree with him." Therefore, Ground Two (C) is denied.

. . . .

Ground Three (B): Defendant alleges that Counsel was ineffective for failing to investigate, depose, and call as . . . witness[es] the responding officers who arrived on the scene of the crime. Defendant alleges that these officers would have testified that numerous people were present that night and that Defendant had the tattoo on his forehead at that point. Both Counsel [sic] and a State witness testified that there were a group of people at the scene of the crime. Therefore, Defendant cannot show any prejudice from Counsel's failure to depose and call the officers. *Darling*, 966 So. 2d at 377 (Defendant cannot show any prejudice from Counsel's failure to present cumulative testimony).

As was more thoroughly discussed in Ground Two, Counsel called a witness to testify that Defendant had the tattoo on his forehead prior to the crime. Therefore, Defendant cannot show any prejudice from Counsel's failure to depose and call the officers. *Darling*, 966 So. 2d at 3 77 (Defendant cannot show any prejudice from Counsel's failure to present cumulative testimony). Moreover, the incident report does not indicate that any of the responding officers made contact with the Defendant and there was no mention of anyone with a forehead tattoo. As no prejudice can be shown, this ground is denied.

"Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*,

575 F.2d 515, 521 (5th Cir. 1978) (citations omitted).[7] Buckley did not present in the

state post-conviction court — and he does not present to this court — any admissible

evidence demonstrating either that any of the these witnesses was available and

willing to testify on his behalf or that any of the witnesses would have testified as he

hypothesizes. *See e.g., Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008)

("To prevail on [a claim of ineffective assistance of counsel for failing to call a

witness], the [applicant] must name the witness, demonstrate that the witness was

available to testify and would have done so, set out the content of the witness's

proposed testimony, and show that the testimony would have been favorable to a

particular defense."); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)

("[E]vidence about the testimony of a putative witness must generally be presented in

the form of actual testimony by the witness or an affidavit. A defendant cannot

simply state that the testimony would have been favorable; self-serving speculation

will not sustain an ineffective assistance claim.") (footnotes omitted); *United States v.

Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (holding that failure to interview a witness

could not constitute ineffective assistance without a showing that the investigation

would have helped the defendant).

Buckley's speculative and unsupported contention that his trial counsel

should have called these witnesses to testify at trial, without more, is insufficient to

---

[7] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

warrant relief.  "[M]ere speculation that missing witnesses would have been helpful is insufficient to meet the [applicant]'s burden of proof."  *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009).[8]  *See also Hill v. Lockhart*, 474 U.S. 52 (1985) (finding that conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (finding that vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).  Because he fails to meet his burden of proving that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying this ground of ineffective assistance of counsel as to witnesses Nangano, Plot and the unnamed police officers, Buckley is not entitled to federal habeas relief.  28 U.S.C. § 2254(d)(1), (d)(2).

### Ditullio, Berry, Petnod, and Cristinzio

The state post-conviction court denied Buckley's claim of ineffective assistance of counsel as to Ditullio, Berry, Petnod, and Cristinzio after an evidentiary hearing as follows (Respondent's Exhibit 4G, Order Denying Defendant's Motion for Post-conviction Relief, pp. 2–12) (court's record citations omitted):

> In Ground Two, the Defendant alleges that Counsel should have called John Dit[ul]lio, John B[e]rry, Corey Petnod, and Christine Cristinzio. Defendant claims that they would have testified that Defendant did not leave his residence during the time of the offense. Defendant alleges they would further testify

---

[8]  "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. Rule 36-2.

they were present at the crime scene and that Shawn Plot[9] committed the crime.

. . . .

**Ditullio's testimony**

At the evidentiary hearing, Ditullio testified on direct examination that he was with the Defendant, Shawn Plot, and a group of approximately 20 people outside their house on March 7, 2006. He further testified that while he was standing out by the street with the Defendant someone ran over to the neighbor, Patricia Wells['s], house and was trying to break into her house. Ditullio testified that the Defendant saw this happen and alerted him to it, telling him to do something about it. Ditullio further testified the person was unsuccessful because Ditullio ran up and grabbed him and dragged him out. Lastly, he testified that counsel never asked him to testify during the Defendant's trial.

During the State's cross-examination, the State established that Ditullio is currently serving a life sentence, and that he has been good friends with the Defendant for many years, considering him to be a father figure. Ditullio stated that he wrote a letter stating that the Defendant was the only person he could trust, and that they were members of the American Nazis. Ditullio stated that he still believed in the American Nazi principles, and that he asked the Defendant not to testify at his own trial. Lastly, Ditullio stated that he did not know who the individual who broke into Patricia Wells['s] house on the night of March 7, 2006 was. He stated that he knew Cory P[etnod], Shawn Plot, John Berry, and Christine Cristinzio. He stated that the man who broke in was a "skinhead hang around" that he recognized, but did not know the name of.

On re-direct, Ditullio testified that the person who broke into the house definitely was not the Defendant.

---

[9] The state post-conviction court's order uses two different spellings of this witness's last name ("Plot" and "Plott"). For consistency, this order identifies the witness as "Plot" as used by Buckley in his application. (Doc. 1)

**The Defendant's Testimony**

On direct examination, the Defendant testified that he was living with Dit[ul]lio around the time of the incident, and that he did not get along with the neighbor, Patricia Wells. He testified that on the night of March 7, 2006, Wells came home with a man, and some people from the group the Defendant was with, including Shawn Plot, chased her inside the house. Defendant testified that at this point he was with Ditullio, Cristinzio, and Berry on their property. He testified that he went to New York to attend a funeral, and after his return he came back and was arrested. The Defendant stated that counsel took over his case approximately seven weeks before his trial, and that he did not waive speedy trial. Defendant testified that he told counsel that he had witnesses, specifically Berry, Ditullio, Cristinzio, and Plot, and told him what they would testify to. However, the Defendant stated that counsel told the State that he was not going to use witnesses. The Defendant sent the witness list directly to the State attorney, yet when the State brought this up at trial, counsel stated he was not going to use witnesses.

. . . .

The Defendant testified that during the trial, the Court inquired of the Defendant whether he was voluntarily making the decision not to call Shawn Plot, and he agreed with the decision. The Defendant testified that the reason he did not bring up the other witnesses he wished to have testify at that point was because his attorney was aware of the other witnesses, and the attorney did not bring it up. The Defendant asserts that he deferred to his attorney's expertise in making this decision. The Defendant claims that the witnesses would testify that Shawn Plot committed the crime, however the State points out that Ditullio contradicted that by testifying that it was not Shawn Plot. The Defendant testified that despite his ineffective assistance of counsel claims, he elected to have the same attorney file his appeal, and has been in contact with the attorney since then, maintaining a good relationship with him.

. . . .

**John Berry and Christine Cristinzio**

At this point, the Court sounded the halls for the witnesses, with no response by either party. The Defense moved for a

bifurcated trial, which was denied by the Court, as it had no reason to believe that either party would be found.

. . . .

## Grady Irvin

The State called Grady Irvin, Defendant's trial counsel, as its witness. . . . As to the claim that counsel was ineffective for failing to call the witnesses, Irvin testified that the defense strategy was misidentification, as the key witness could not identify who was fleeing from her house. Irvin testified that he did not call Ditullio as a witness because, "Strategically he wouldn't have bettered our position at all. He would have made it worse, quite frankly." Due to the negative publicity surrounding Ditullio, counsel determined he would not make a good witness. He maintained that if he tried the case again, he still would not call him, as he doesn't find him to be a credible witness. As to the other witnesses — John Berry, Cory P[etnod], or Christine Cristinzio — Mr. Irvin testified that he did not believe that Defendant had told him the witnesses would present the testimony described in his rule 3.850 motion, but that even if he had, Irvin would not have put them on the stand, "because to put them on the stand would have afforded them the opportunity to give testimony that was not candid." Irvin testified that calling these witnesses was against his trial strategy, which was that Defendant was not even present at the time of the incident. Irvin confirmed that he still has a good relationship with the Defendant, and represented him on his appeal *pro bono*. Towards the end of his testimony, Irvin again stated that he had no recollection of the Defendant telling him to call Ditullio, P[etnod], Berry, or Cristinzio.

. . . .

## Closing Statements

. . . .

Briefly, the State argues that the Defendant failed to produce some of the witnesses, and that Mr. Ditullio's testimony evidences that he was not a credible witness — testifying only that a mystery person committed the crime, with no further details. At this point the Court brought Mr. Ditullio back out, and established that the person he pulled away from the door was not Shawn Plot. The State argued that Mr. Irvin's

- 37 -

testimony was that he didn't believe the witnesses would be credible. Lastly, the State argues that the Defendant has not demonstrated deficient performance or resulting prejudice as to either claim.

Defense counsel conceded that from Mr. Irvin's testimony, it would have been inconsistent with his trial strategy to call the witnesses . . . .

**Analysis**

. . . .

As to the Defendant's remaining claim — that Counsel was ineffective for failing to call John Ditullio, John B[e]rry, Corey Petnod, and Christine Cristinzio [—] the Court finds that this was a reasonable trial strategy. Mr. Irvin explained that based on his conversations with the Defendant, he did not believe that the Defendant was even present when the crime was committed, and was proceeding under a theory of misidentification. Given the fact that all four witnesses would have provided contrary testimony, Mr. Irvin stated that he did not find them to be credible witnesses, and did not believe that they would help the Defendant's case. Reasonable trial strategy is not subject to collateral attack in a motion for post-conviction relief. *See Lemarca v. State*, 931 So. 2d 838. Based on the above, this claim is denied.

Buckley fails to establish that his trial counsel rendered ineffective assistance by not calling either Ditullio, Berry, Petnod, or Cristinzio as a witness at trial. Trial counsel must decide which strategic and tactical option to pursue. *See, e.g., Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it."). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will

seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*). A habeas petitioner must overcome the presumption that counsel's conduct was a matter of strategy. *Strickland*, 466 U.S. at 689. A defendant's disagreement with counsel's tactics or strategy will not support a claim of ineffective assistance of counsel.

The record supports the state post-conviction court's conclusion that counsel strategically decided to not call either Ditullio, Berry, Petnod, or Cristinzio as a witness at trial. The reasonableness of counsel's decision is supported by the evidentiary hearing testimony discussed in the state court's order. Buckley fails to meet his burden of proving that the state court either unreasonably applied *Strickland* or unreasonably determined the facts by rejecting this ground of ineffective assistance of trial counsel. 28 U.S.C. § 2254(d)(1), (d)(2).

**Grounds Three and Five**

In ground three Buckley contends that his trial counsel rendered ineffective assistance by (1) not deposing either the state's witnesses or "any of the witnesses of which Petitioner informed counsel prior to trial," (2) not deposing the police officers who responded to the crime scene, (3) not investigating, interviewing, or deposing the victim, and (4) not requesting or obtaining an expert witness. In ground five Buckley contends that his trial counsel rendered ineffective assistance by not calling both Dr. Rahiam and Dr. Teeman as expert witnesses at the sentencing hearing. Buckley alleges that "[b]oth doctors were present and available to testify at

sentencing as to [Buckley]'s health, mental state, and need for treatment." (Doc. 1, p. 15) Buckley alleges that he would have received a lesser sentence if the doctors had testified. The respondent opposes both grounds as procedurally barred from federal review because Buckley did not appeal the denial of either ground. In his reply Buckley asserts entitlement to a merits review of both grounds review under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).

An applicant must present each claim to a state court before raising the claim in federal court. "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995), *Picard v. Connor*, 404 U.S. 270, 275 (1971). *Accord Rose v. Lundy*, 455 U.S. 509, 518–19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."), and *Upshaw v. Singletary*, 70 F.3d 576, 578 (11th Cir. 1995) ("[T]he applicant must have fairly apprised the highest court of his state with the appropriate jurisdiction of the federal rights which allegedly were violated.").

The state post-conviction court summarily denied both of Buckley's grounds of ineffective assistance of counsel. (Respondent's Exhibits 4B, p. 5 and 4E, pp. 5–7) Buckley did not appeal the denial of either ground. As a result, Buckley deprived the state court of a "full and fair opportunity to resolve any constitutional

issues by invoking one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. *See also Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979) ("In Florida, exhaustion usually requires not only the filing of a Rule 3.850 motion, but an appeal from its denial.") (citations omitted). Consequently, Buckley's two grounds of ineffective assistance of counsel are unexhausted. State procedural rules preclude Buckley from returning to state court to present these grounds in a second collateral appeal, rendering the grounds procedurally defaulted. Fla. R. Crim. P. 3.850(k).

"If the [applicant] has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, an applicant "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, an applicant must demonstrate not only that an error at the trial created the possibility of prejudice but that the error worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152 (1982). In other words, an applicant must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

In his reply Buckley argues entitlement to federal review under *Martinez* and *Trevino* because his post-conviction appellate counsel failed to appeal the denial of these two grounds of ineffective assistance of trial counsel. (Doc. 14, pp. 9, 12) Buckley's reliance on *Martinez* and *Trevino* is misplaced. *Martinez* recognizes a narrow exception to the exhaustion requirement announced in *Coleman v. Thompson*, 501 U.S. 722 (1991), for a claim of ineffective assistance of trial counsel. *Martinez* is limited to an attorney's error in initial review collateral proceedings:

> The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, *including appeals from initial-review collateral proceedings*, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. *See* 501 U.S., at 754, 111 S.Ct. 2546; *Carrier*, 477 U.S., at 488, 106 S.Ct. 2639. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

566 U.S. at 16 (emphasis added). *See also Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1260 (11th Cir. 2014) ("Importantly, the *Martinez* rule is expressly limited to attorney errors in initial-review collateral proceedings."). The ineffective assistance of post-conviction appellate counsel provides no cause for Buckley's failure to exhaust his grounds of ineffective assistance of trial counsel. Accordingly, Buckley fails to establish cause and prejudice to overcome the procedural default of either ground three or ground five.

Absent a showing of cause and prejudice, an applicant may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct

a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495 96 (1986). A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone who is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet the "fundamental miscarriage of justice" exception, Buckley must show constitutional error coupled with "new reliable evidence — whether . . . exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Buckley cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Buckley satisfies neither exception to procedural default, both ground three and ground five are procedurally barred from federal review.

**Grounds Four and Six**

In ground four Buckley contends that his trial counsel rendered ineffective assistance by not specifically informing him that if he chose to testify at trial, "the [s]tate would then be able to tell the jury about all of his prior criminal convictions." (Doc. 1, p. 10) Buckley alleges that this advice was "completely erroneous" and caused him to not testify. In ground six Buckley contends that his trial counsel rendered ineffective assistance by not objecting to allegedly improper statements by the prosecutor in the state's closing argument.

The respondent opposes both ground four and ground six as procedurally defaulted because Buckley in his *pro se* appellate brief argued only that the state post-conviction court failed to refute these grounds by not attaching to its order denying his Rule 3.850 motion portions of the record that conclusively rebut his allegations. (Respondent's Exhibit 7B, pp. 5–6) Buckley did not raise a federal constitutional argument challenging the post-conviction court's rejection of either ground of ineffective assistance of trial counsel. Having chosen to seek appellate review of only the procedural issue, Buckley failed to sufficiently present for appellate review the denial of each constitutional ground of ineffective assistance of trial counsel. This failure to invoke the state court's established appellate review process renders both ground four and ground six unexhausted. State procedural rules preclude Buckley from returning to state court to present these grounds in a second collateral appeal, resulting in a procedural default. Fla. R. Crim. P. 3.850(k).

In his reply Buckley again asserts entitlement to federal review under *Martinez* and *Trevino* based on his post-conviction appellate counsel's failure to challenge on appeal the denial of these two grounds of ineffective assistance of trial counsel. (Doc. 14, pp. 11–13) Because the ineffective assistance of post-conviction appellate counsel provides no cause for his failure to exhaust these grounds, Buckley cannot satisfy the cause and prejudice exception to overcome the procedural default. He cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327.

Because Buckley satisfies neither exception to procedural default, both ground four and ground six are procedurally barred from federal review.

**Ground Seven**

Buckley contends that his trial counsel rendered ineffective assistance by not ensuring that the trial judge made the necessary findings required under Section 775.084(3)(a)(4), Florida Statutes, for application of the habitual felony offender sentencing enhancement.[10] The state post-conviction court summarily denied this ground as follows (Respondent's Exhibit 4B, Order Granting Motion for Post-Conviction Relief in Part and Denying in Part, pp. 8–9) (court's record citations omitted):

> Defendant claims that counsel was ineffective for not requiring the Court to make the requisite findings prior to Defendant being sentenced as a habitual felony offender. He alleges that the Court made a "generic" finding and that this prejudiced him. However, Defendant has failed to establish prejudice since the State did present evidence at the sentencing hearing that Defendant met the criteria. Specifically, the State presented certified copies of the judgment and sentences setting forth the reasons Defendant qualified as a habitual felony offender. The record reflects that counsel reviewed the documents and the defense did not dispute the documents presented to the Court. The Court then acknowledged that there was no argument as to whether the Defendant qualified as a habitual felony offender under the statute and Defendant does not now set forth what those arguments could have been. Accordingly, this claim must fail since Defendant has not established how he has been prejudiced.

---

[10] Section 775.084(3)(a)(4), Florida Statutes, requires a sentencing court to find by a preponderance of the evidence each of the elements necessary for application of the habitual felony offender enhancement.

At the sentencing hearing the state presented to the trial judge (1) certified copies of two of Buckley's prior convictions, (2) a certified business record from the state parole commission indicating that Buckley had received no pardon or clemency from any of his Florida convictions, and (3) a certified record from the Florida Department of Corrections that includes Buckley's photograph, fingerprints, and documentation that Buckley was released from prison less than five years before he committed the burglary. (Respondent's Exhibit 1, Vol. I, Ex. H, pp. 9–11) During the sentencing hearing trial counsel discussed with Buckley the documents presented by the state. Trial counsel advised the court that he reviewed the documents with Buckley and that "we don't dispute any of the documents that have been presented to the court." (Respondent's Exhibit 1, Vol. I, attach. H, transcript of July 13, 2007, sentencing hearing, p. 11) Buckley does not challenge the validity of either his prior felony convictions or the documents offered by the state to support the application of the sentencing enhancement. Buckley also does not state what "requisite finding" the sentencing court failed to find by a preponderance of the evidence as required by state statute. Consequently, Buckley establishes neither deficient performance by trial counsel nor resulting prejudice. The state court decision denying this ground of ineffective assistance of trial counsel is neither contrary to, nor an unreasonable application of, *Strickland*, and Buckley is entitled to no relief on this ground.

Accordingly, Buckley's application for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk must enter a judgment against Buckley and close this case.

## DENIAL OF BOTH
## A CERTIFICATE OF APPEALABILITY
## <u>AND LEAVE TO APPEAL IN FORMA PAUPERIS</u>

Buckley is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Buckley must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. See 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Buckley is entitled to neither a COA nor leave to appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Buckley must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on February 14, 2019.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE